**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DENNIS G. RICHARD,

       Plaintiff,

                                    **Case No.: 2:15-cv-2647**
    v.                              **JUDGE SMITH**
                                      **Magistrate Judge Deavers**

CALIBER HOME LOANS, INC., *et al.*,

       Defendants.

## OPINION AND ORDER

This matter is before the Court upon the Motion for Summary Judgment (Doc. 86) of Defendants Caliber Home Loans, Inc. ("Caliber") and VOLT RPL XI Asset Holdings Trust ("Volt") and the Motion for Partial Summary Judgment (Doc. 102) of Plaintiff, Dennis Richard. Plaintiff opposed Defendant's Motion (Doc. 89) and Defendants replied in support (Doc. 91). Defendants opposed Plaintiff's Motion (Doc. 106) and Plaintiff replied in support (Doc. 109). The Motions are now ripe for review. For the following reasons, the Motions are **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

This case arises from a mortgage obtained by Dennis Richard ("Plaintiff") for a home purchased in 2005. (Doc. 3, Compl. at ¶ 23). This lawsuit is Richard's third lawsuit against Caliber relating to their servicing of his mortgage. Each of the earlier two lawsuits resulted in settlements and dismissals of Plaintiff's lawsuits. Plaintiff brought suit in this case, alleging violations of the Fair Debt Collections Practices Act ("FDCPA"), the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*

The first lawsuit between the parties arose shortly after Caliber took over servicing of Plaintiff's loan from CitiMortgage in March 2011. While working with CitiMortgage, Plaintiff attempted to obtain a Home Affordable Modification Program ("HAMP") loan modification to reduce his monthly payments. (Doc. 1, Compl. at ¶ 33). As part of his attempts to obtain the HAMP modification, Plaintiff stopped paying his escrow and built up a deficiency in his escrow account. (*Id.* at ¶ 32; Doc. 102, October 2012 Statement at PAGEID# 2876 (showing $8,857.32 escrow deficiency)). Before he could complete the required trial HAMP payments, Caliber took over the servicing of his loan and filed a foreclosure action against him. (Doc. 1, Compl. at ¶ 36; Doc. 74-1, Stipulated Exs. at PAGEID# 1056). The parties settled the case and signed a Mortgage Modification Agreement ("Mortgage Modification") on September 26, 2012. (Doc. 74-1, Stipulated Exs. at PAGEID# 1091–094). Following the first settlement, Plaintiff alleges that Caliber "incorrectly gave Mr. Richard a negative escrow account." (Doc. 89, Mem. Opp. at 2 (citing Doc. 84-9, Annual Escrow Account Disclosure Statement ("Escrow Statement"))). The First Settlement Agreement explicitly states that the "[u]nless expressly stated in the Loan Modification Agreement, the terms of the Note and Mortgage will continue to control." (Doc. 74-1, Stipulated Exs. at PAGEID# 1087).

The Mortgage Modification stated that Plaintiff owed unpaid fees or advances to Caliber of $7,197.46 as of 8/27/2012. (*Id.* at PAGEID# 1091). The Mortgage Modification stated that Plaintiff's new principal and interest payment ("P&I") would be $919.87 and his escrow would be $442.80 for a total monthly payment of $1362.67. (*Id.* at PAGEID# 1092). There is evidence that the agreed escrow payment of $442.80 included payments for both the normal monthly

escrow payment and an "escrow adjustment" payment designed to repay the existing deficiency.[1]

Further, there is nothing which expressly states that Caliber released Plaintiff from the liability of

paying down the "unpaid fees or advances due to Servicer of $7,197.46." (*Id.* at PAGEID#

1092). The Mortgage Modification further states that "Borrower has been advised of the amount

needed to fully fund the T&I Escrow Account." (*Id.* at PAGEID# 1093).

On November 25, 2013, Caliber analyzed Plaintiff's escrow account and sent him an

Annual Escrow Statement. (Doc. 84-9, 2013 Annual Escrow Statement). The Escrow Statement

stated that in September 2012, Plaintiff had an actual escrow balance of -$7102.71. (*Id.*). The

statement also noted that Plaintiff's insurance and tax bills had increased from $3633.30 to

$4030.09 in the last year. (*Id.*). The negative escrow balance and the increased tax and

insurance bills necessitated both an increased escrow payment (from $302.77 to $335.84) and an

increased escrow adjustment payment (from $163.36 to $214.41). (*Id.*). The Escrow Statement

informed Plaintiff that his regular monthly payment would be increasing from $1406.00 to

$1470.12. (*Id.*).

Plaintiff sued Caliber and VOLT again in April 2014, alleging that Defendants breached

the First Settlement Agreement by asking for fees, charges, interest, and escrow deficiencies.

(Doc. 74-1, Stipulated Exs. at PAGEID#1107–108, ¶¶ 1–5). The parties would eventually settle

the case, but the discussions and payments while the case was pending are important to this

matter. While the case was pending, Plaintiff allegedly made payments below $1470.12, starting

in May 2014. From May 2014, until January 2015, Plaintiff paid Caliber $1255.71. (Doc. 84-

---

[1] Plaintiff's 2013 Annual Escrow Statement shows a monthly escrow payment of $335.84 and the December 2014
Annual Escrow Statement shows a payment of $333.94. (Doc. 84-9, 2013 Annual Escrow Statement; Doc. 86-3,
Alexis Aff. Ex. 4 at PAGEID# 2374). It is unlikely that Plaintiff's base escrow payment would have dropped from
$442.80 to $335 in a year. Deficiencies in escrows can build up from non-payment and from increases in the price
of home insurance and tax bills.

11, Checks at 1–8). This payment was $214.41 below the payment Caliber requested until October, and $118.87 below the payment Caliber requested in November and December. (*Id.*).

Prior to the Second Settlement Agreement being signed, Counsel for Caliber, attorney Greg Folland informed Plaintiff's counsel, Andrew Gerling on December 17, 2014, that "your client did not and has not made the correct full payment for some time," and that Plaintiff was past due for November and December. (Doc. 74-1, Stipulated Exs. at PAGEID# 1199-200). On December 22, 2014, Plaintiff's counsel emailed Caliber's counsel asking if Plaintiff needed to send only $240 to get caught up. (*Id.*). Caliber's counsel did not respond. (*Id.*). Caliber alleges Plaintiff needed to pay $1493.45—an amount consisting of the full amount of the December 2014 monthly payment, and $118.87 that was short in the November payment. (Doc. 86-3, Alexis Aff. at ¶ 27). Caliber claims that Plaintiff knew he owed $1493.45 at this time and that it was understood that he would pay that amount he owed toward his monthly payments. (*Id.* at ¶ 29). In December 2014, Caliber sent a second Escrow Analysis to Plaintiff noting that he had a shortage of $7246.55. (*Id.* at Ex. 4, PAGEID# 2374).

Plaintiff signed the 2nd Settlement agreement on December 17, 2014 and Caliber signed on January 8, 2015. In the Second Settlement Agreement Caliber and Plaintiff agreed that Caliber would "spread the repayment of current escrow deficiency shortage over a period of sixty (60) months." (Doc. 74, Second Settlement Agreement at 1). As part of the settlement, Caliber agreed to pay Plaintiff $20,750 in exchange for settlement and to waive the interest and fees that Caliber had asked him to pay. (*Id.*). E-mails between counsel for the parties also show that Caliber agreed to spread the shortage over 60 months by reducing Plaintiff's monthly payment to $1370 and that Plaintiff's attorney stated that Plaintiff agreed that he could pay that

amount.  (Doc. 74-1, Stipulated Exs. at PAGEID# 202–07).  Again, neither party delineated how that payment would be divided.  (*Id.*).

A December 2014 Escrow Analysis states that Plaintiff's new payment will be $120.77.  (Doc. 86-3, Alexis Aff. Ex. 4 at PAGEID# 2374).  The December Escrow Analysis states that the P&I remained at $919.87, the Escrow was reduced to $333.94, and Plaintiff owed an escrow adjustment of $1374.58.  (*Id.*).  After the settlement, Plaintiff increased his payment to $1370 and eventually to $1374.58.  (Doc. 84-11, Checks at 9).

In a March 16, 2015 statement, Caliber informed Plaintiff that he had a past due amount of $2749.16, a monthly payment due of $1374.58, and unapplied funds of $1127.68.  (Doc. 84-1, March 2015 Mortgage Statement at PAGEID# 1839).  This meant that in addition to his monthly payment of $1374.58, Plaintiff owed $1621.48 to Defendants to become current on his mortgage. Plaintiff alleges this is the first time Caliber informed Plaintiff that he was past due despite the earlier email from Caliber's counsel to Plaintiff's counsel informing Plaintiff that he made insufficient payments for months.  It is not entirely clear from where the $1621.48 figure derives as neither party directs the Court to statements showing the building up of that sum.  Caliber alleges that the past due amount had increased since December 2014 "due to fees, charges and expenses as permitted by the terms of the Note and Mortgage."  (Doc. 86-3, Alexis Aff. at ¶ 31). On the back of the mortgage statement, it stated: "Notice of Error, Requests for Information and Qualified Written Requests (as defined in RESPA) must be sent to: PO BOX 24610, Oklahoma City, OK 73124"  (*Id.* at PAGEID# 1840).

Regardless of whether Plaintiff actually owed $1621.48 to Caliber or whether Caliber properly spread out the escrow deficiency payments, the remainder of this case revolves around three Qualified Written Requests ("QWR") sent by Plaintiff to Caliber.  The first two QWRs

were sent in April and August 2013, prior to the second lawsuit. (Doc. 74-1 Stipulated Exs. at PAGEID# 1096–99). In the First QWR, Plaintiff asked for the following items in accordance with RESPA:

1. The name, address, and telephone number of the owner of the note, plus the name of the master servicer of the note.

2. The date that the current note holder acquired the note, and from whom it was acquired.

3. The date your company began servicing the loan.

4. A complete payment history of how payments and charges were applied, including the amounts applied to principal, interest, escrow, and other charges.

5. The current interest rate on this loan and an accounting of any adjustments.

6.  A complete copy of the loan closing documents, including a copy of the note, mortgage, and any modifications thereof.

7  A copy of all appraisals, property inspections, and risk assessments completed for this account.

(*Id.* at PAGEID# 1096). The First QWR also asked for "the name, address, and telephone number of the owner of his obligation plus the master servicer of his obligation," in accordance with TILA. (*Id.* at PAGEID# 1097). The Second QWR specifically asked for clarification of the interest, fees, and escrow balance that would form the basis of the second lawsuit. (*Id.* at PAGEID# 1099).

The Third QWR was sent on April 15, 2015, by Plaintiff's Counsel to Caliber's Counsel. (*Id.* at PAGEID# 1255–56). Prior to the sending of the Third QWR, Plaintiff's Counsel asked Caliber's counsel if Plaintiff's Counsel could contact Caliber on Plaintiff's behalf. The attorneys had the following exchange:

Gerling: "Mr. Richard has asked that I contact Caliber regarding the alleged missed payment. I advised him I cannot communicate with Caliber so long as it has representation without express consent. Please advise if I may contact Caliber directly."

Folland: "No you can't.  Is there some reason he cannot do so?"

Gerling: "Mr. Richard's efforts to communicate with Caliber only result in frustration as evidenced by the history of litigation between the parties."

(*Id.* at PAGEID# 1218–19).  Based on this conversation, the Third QWR states: "Dear Attorney Folland, I [Andrew Gerling] represent Dennis G. Richard with respect to the above-referenced account.  Pursuant to Ohio Professional Rule of Conduct 4.2, and given your refusal to consent to allow me to contact Caliber Home Loans ("Caliber") directly.  I am sending this request directly to you on behalf of your client."  (*Id.* at PAGEID# 1255).  Plaintiff mailed this letter to Caliber's counsel's address.  (*Id.*).  In the letter, Plaintiff disputes his past due amount as not being owed and states that he made all payments timely during and since the conclusion of the second lawsuit.  (*Id.*).  He also asked for the following information:

1. Identify specifically the exact month(s), and the amount(s) of the payment, Caliber claims Mr. Richard did not submit resulting in the past due amount.

2. Identify specifically any and all fees, charges, and advances assessed against this account from December 17, 2014 to the present.

3  The name, address, and telephone number of the owner of the note, plus the name of the master servicer of the note.

4. The date that the current note holder acquired the note and mortgage, and from whom they were acquired.

5. The date Caliber began servicing the loan.

6. A complete payment history of how payments and charges were applied, including the amounts applied to principal, interest, escrow, and other charges.

7. The current interest rate on this loan and an accounting of any adjustments.

8. A statement of the amount necessary to reinstate this loan.

9. A complete copy of the loan closing documents, including a copy of the note and mortgage.

10. A copy of all appraisals, property inspections, and risk assessments completed for this account.

       11. Caliber's preferred address for receiving QWRs and notices of error, if it differs from the address this QWR was sent to.

(*Id.* at PAGEID# 1255–56). As with the First QWR, Plaintiff again asked for "the name, address, and telephone number of the owner of their note, plus the name of the master servicer of their note" in accordance with TILA. (*Id.*).

       After Plaintiff's Third QWR, Caliber sent Plaintiff four letters, dated April 21, 2015, April 24, 2015, May 1, 2015, and May 22, 2015. The first letter informed Plaintiff that he was in default and that he owed two payments of $1374.58 for March, 2015 and April 2015. (Doc. 74-1, Stipulated Exs. at PAGEID# 1261). It stated that Plaintiff still had $1123.10 in unapplied funds and that he needed to pay $1626.06 to cure his default. (*Id.*). Neither party explains why Plaintiff's monthly payment is sometimes $1370 and later $1374.58.[2] Despite being sent less than a month after the March 16, 2015 Statement, this Caliber response notes that Plaintiff's past due amount is the same as it was before, but that his unapplied funds have reduced from $1127.68 to $1123.10. (*Id.*). Neither party explains the change in this number.

       Caliber's April 24, 2015 letter informed Plaintiff that his loan is due for the March 1, 2015 and subsequent payments, that Caliber began servicing the loan on March 1, 2011 and that the last payment was received on March 30, 2015. (*Id.* at PAGEID# 1265–66). Caliber again told Plaintiff that his reinstatement amount was $1626.06. (*Id.*). It also included an accounting of Plaintiff's payoff quote noting that he to pay off his mortgage, he would owe $131679.83 in principal, $2473.06 in accrued interest, $28 as a reconveyance fee, $7234.24 in escrow deficit,

---

[2] The payments made in January, February, and March of 2015 were for $1370. (Doc.84-11, Checks at PAGEID# 1915–17). The checks written in April, May, and June were for $1374.58. (*Id.* at PAGEID# 1918–20). Plaintiff's own notes on the payment slips indicate his escrow payment increased by $4.71. (*Id.*). The checks written on August 24, August 25, October 21, and November 25 were for $1375. (*Id.* at 1921–24).

and that he had $1123.10 in unapplied funds. (*Id.* at PAGEID# 1269). The May 1, 2015 letter was a past due notice which contained little new information. (*Id.* at PAGEID# 1272).

Caliber sent another letter on May 22, 2015, directly responding to Plaintiff's Third QWR. The letter informs Plaintiff that his past due amount "reflects his past due payments for the month of March 2015 and April 2015 monthly payments." (*Id.* at PAGEID# 1275). Caliber also responded to the Plaintiff's numbered requests:

1. Please refer to enclosed payment history.

2. Caliber has not accessed [sic] fees, charges and advances against this acct from December 17, 2014 to the present. Please refer to enclosed payment history.

3. Please refer to enclosed copy of the Adjustable Rate Note.

4. Caliber Home Loans Inc. is the current Note holder. We acquired the loan March 1, 2011 from Citimortgage.

5. March 1, 2011.

6. Please refer to enclosed payment history.

7. Current interest rate to date 6.000%.

8. Please refer to enclosed billing statement

9. Please refer to enclosed documents.

10. Caliber has not completed property inspections and risk assessments to this account.

11. Not applicable.

(*Id.* at PAGEID# 1274–75).

Plaintiff filed this lawsuit against Caliber and VOLT, alleging violations of RESPA, TILA, and the FDCPA alleging that Defendants' actions in this case were violations of all three federal statutes. Defendants counterclaimed for breach of contract, alleging that Plaintiff breached the Second Settlement Agreement by disputing amounts owed which he waived in the

Second Settlement Agreement.  The parties have now filed cross-motions for summary judgment as to both Plaintiff's Complaint and Defendants' counterclaims.

## II.     STANDARD OF REVIEW

Both Plaintiff and Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249– 50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").  In considering the factual allegations and evidence presented in a motion for summary judgment,

the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id.*

That the parties have filed cross-motions for summary judgment does not alter the Court's standard of review. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions."). Thus, in reviewing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III. DISCUSSION

Defendants moved for summary judgment as to all of Plaintiff's claims and their own remaining claims. Plaintiff's Partial Motion for Summary Judgment asks for judgment as to his RESPA, TILA, and FDCPA claims and as to Defendants claims. Before addressing the specific statutory claims, the Court will first address the debt that Caliber claims Plaintiff failed to pay.

### A. Whether Plaintiff Owed the Past Due Amount

Caliber claims the debt it informed Plaintiff he owed stems from underpayments in 2014 when he chose not to make his escrow adjustment payments. The Court has made numerous efforts to trace the amounts that were allegedly due from the duplicitous and numerous filings in this case without success. There is no genuine issue of material fact that after the First Settlement Agreement, Plaintiff still had an escrow deficiency and was therefore required to pay an escrow adjustment. There is also no genuine issue of material fact that Plaintiff unilaterally decided to stop paying the amount of that adjustment in May 2014.

Although Plaintiff indicated that his short payments were to cover his P&I and his escrow, Plaintiff's decision to underpay his amount due in 2014 did not solely increase his or fail

to reduce his escrow deficiency because Plaintiff does not get to determine how his payments are applied. The Mortgage between the parties states that partial payments may be held until the borrower makes a payment to bring the loan current, at which time, the funds are "applied in the following order of priority: (a) interest due under the note; (b) principal due under the note; (c) amounts due under Section 3." (Doc. 74-1, at PAGEID# 1043). Section 3 concerns the escrow. (*Id.*). Essentially, the Mortgage gives Caliber the right to apply insufficient payments to outstanding balances first before applying the funds to the P&I for the next payment. In this case, when Plaintiff underpaid by $214.41 in May 2014, then upon receiving the June 2014 payment, Caliber applied $214.41 from the June payment to the May payment to bring the May payment current. Then, the June payment was $428.62 short and was held until Plaintiff paid that balance off. Payment 3, in July 2014 provided the funds to bring the June payment current but then the July payment was $643.23 short. As this process went on, Plaintiff's amount due became greater than just the escrow balance and his payments begin to be short on his P&I. The October payment then needed $1286.46 from the November payment to make his account current.

To this day, Plaintiff still has not fully paid down the full escrow deficiency that existed prior to the First Settlement Agreement. Accordingly, at the time of the Second Settlement Agreement, Plaintiff had (1) an escrow deficiency that has existed since before the First Settlement Agreement and has been reduced slightly by his payments in 2014; and (2) a past due amount that exists from his short payments in 2014. The Court will address each in turn.

### 1. Escrow Deficiency

The parties agreed in the Second Settlement Agreement that Caliber would spread the escrow deficiency over 60 months. There is no genuine issue of material fact that this occurred.

Plaintiff's belief that this amount was not spread out stems from the misunderstanding that his short payments in 2014 only increased his escrow shortage. Caliber's December 2014 escrow analysis states that in October 2014, Plaintiff's escrow was deficient by $5153.80. The "Total Escrow Shortage" amount was -$7246.55.[3] Spread over sixty months, that adjustment would cost Plaintiff $120.77 per month. The Escrow Analysis also states that Plaintiff's regular escrow deposit at the time was $333.94 and that the adjustment was $120.77 for a total of $451.74. In May 2015, Plaintiff paid $454.71 towards his escrow. Accordingly, Plaintiff's contention that Caliber breached the Second Settlement Agreement by failing to spread out the escrow is incorrect. Summary judgment in favor of Defendants is **GRANTED** as to any claim that Caliber violated the FDCPA or breached the Second Settlement Agreement for failing to spread out the escrow shortage,

### 2. Past Due Payments

Next, the Court must address whether Caliber or Plaintiff have sufficiently proven that the amount requested in the March 2015 statement was either due or not due respectively. The Court has been unable to determine whether the figures provided by Caliber were actually due and owing at the time Caliber asked for them. First, Caliber contends that Plaintiff owed $1493.45 as of December 17, 2014. The Court cannot reproduce this figure from the documents provided at this time. Caliber alleges that Plaintiff was aware of this amount at the time he signed the Second Settlement Agreement but there is no evidence to support such an assertion. While it is true that Caliber's counsel informed Plaintiff's counsel that Plaintiff had made short payments, there is no evidence the figure of $1493.45 was ever communicated to Plaintiff or his representatives. Further, Alexis also states that this amount increased "due to fees, charges, and

---

[3] The "Total Escrow Shortage" is the sum of the expected low balance in the escrow account over the next year and the Allowable Required Balance.

expenses as permitted by the terms of the Note and the Mortgage." (Doc. 86-3, Alexis Aff. at ¶ 31). This too is insufficient to show that Plaintiff actually owed the amount in question. There is no documentation showing that fees, charges, and expenses were charged to Plaintiff's account or when they were charged.

Next, the parties also argue that each has waived its right to question whether Plaintiff owes this money. Caliber alleges that it "entered into the Second Settlement Agreement with the understanding that Mr. Richard would pay the $1493.45 he owed toward his monthly mortgage payments." (Doc. 86-3, Alexis Aff. at ¶ 31). Plaintiff alleges that he believed that the execution of the Second Settlement Agreement brought his account current. Neither of these understandings or beliefs were memorialized in the Second Settlement Agreement. However, the Court must address each party's claim of waiver. First, the Court is unable to make a finding on Plaintiff's waiver because, as noted above, there is currently insufficient proof that the amount about which Plaintiff is now suing is actually the same amount that existed prior to the Second Settlement Agreement.

Plaintiff contends the Second Settlement Agreement was a fully integrated contract, meaning that Caliber could not assert that Plaintiff still owed him past due amounts. The Second Settlement Agreement does not bar Caliber from seeking the underpayments made by Plaintiff. In the Second Settlement Agreement, there is a "Full Agreement" clause which notes that the "Agreement represents the full and complete agreement of the parties, and that this Agreement supersedes and replaces any prior agreements, whether oral or written, with the exception of any applicable notes or mortgages." (Doc. 74, Stipulated Exs. at PAGEID# 1158–59). As Plaintiff suggests, "the Second Settlement Agreement detailed all of the parties' obligations under the contract." (Doc. 102, Pl.'s Mot. at 14). However, this does not mean that both parties waived all

other claims. Plaintiff asks the Court to read the merger clause as a waiver clause. But this contract did contain a waiver clause and Caliber waived no claims in it. (Doc. 74, Stipulated Exs. at PAGEID# 1158). In fact, the merger clause specifically exempts "any applicable notes or mortgages." (*Id.* at PAGEID# 1158–59). Accordingly, Caliber could continue to impose the obligations contained in the Mortgage against Plaintiff unless otherwise modified by the Second Settlement Agreement. One such obligation would be prompt and full payment as required by the mortgage which Defendants allege Plaintiff did not do.

Further, "[a] written integration clause is conclusive evidence that the parties intended the document to be the final and complete expression of their agreement." *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002). An integration clause operates as a bar from a party later asserting that the contract contained more agreements than were included in the writing. It is clear from the documents submitted by both parties that there were outstanding issues of payment that were never agreed upon and the parties did not agree at the time the Second Settlement Agreement was signed. There is nothing in the contract where Defendants agree to waive Plaintiff's late payments or the fees for those late payments.

Accordingly, the Court **DENIES without prejudice** the Motions for Summary Judgment on the claims which relate to the underlying past due amount, specifically the $1626.06 requested. These claims include Plaintiff's FDCPA claims under §§ 1692e(2)(A) and 1692e(5), which allege that Defendants could not seek that payment or foreclosure for his failure to pay that amount and Defendants' contract-based claims. Because the issue of whether the amount due was actually owed is dispositive for a significant number of claims, the Court **ORDERS** Defendants to provide sufficient evidence that the underpayments in 2014 directly led to the amount due that was sent to Plaintiff in March 2015. This evidence should include, but should

not be limited to, documents evidencing the existence of the debt, documents evidencing the imposition of any fees or costs, and evidence which provides the dates of Plaintiff's changing amount due. The Court now moves to the remaining statutory claims.

**B.      FDCPA**

Plaintiff claims that Caliber violated the FDCPA in numerous ways, alleging that Caliber employed false or misleading means to collect a debt under 15 U.S.C. §§ 1692e(2) and (5), and that Caliber violated § 1692f by filing frivolous counterclaims and by seeking payments not discussed in the Second Settlement Agreement.

Most of Plaintiff's claims fall under the general umbrella of § 1692e.  A § 1692e claim requires a showing of four elements: "(1) plaintiff must be a 'consumer' as defined by the Act; (2) the 'debt' must arise[ ] out of transactions which are 'primarily for personal, family or household purposes;' (3) defendant must be a 'debt collector' as defined by the Act; and (4) defendant must have violated § 1692e's prohibitions." *Wallace v. Wash. Mut. Bank*, F.A., 683 F.3d 323, 326 (6th Cir. 2012).  Courts view potential violations of § 1692e through the least sophisticated consumer test.  *Gionis v. Javitch, Block, Rathbone, LLP*, 238 F. App'x 24, 28 (6th Cir. 2007).  "'The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd.'"  *Id.* (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993)).  There is no dispute that the first three elements are met.  Plaintiff is a consumer who took out the loan for personal purposes and Caliber is a debt collector.  The Court now addresses the fourth element of Plaintiff's remaining §§ 1692e and 1692f claims—whether Defendants violated those provisions.

**1.  Settlement Agreement**

Plaintiff contends the Second Settlement Agreement was a fully integrated contract, meaning that Caliber could not assert that Plaintiff still owed money and thus, violated

§ 1692f(1). Section 1692f(1) prohibits the "collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Plaintiff's argument is not well taken simply because he does not allege that the Second Settlement Agreement was the agreement which created the debt. The payment sought by Caliber was expressly authorized by the Mortgage Agreement which is the document which created the debt. Even if Plaintiff could show the Second Settlement Agreement "created the debt" as required by § 1692f(1), the Second Settlement Agreement still does not bar Caliber from seeking the underpayments made by Plaintiff as discussed above in Section III.A.2.

### 2. Different Due Dates

Plaintiff claims that "Caliber . . . violated § 1692e(2)(A) by providing conflicting dates by which Mr. Richard had to pay the erroneous amount Caliber claimed was due." (Doc. 102, Pl.'s Mot. at 21). Presumably, Plaintiff is arguing that representing that the amount was due on two different days is a false representation of the legal status of the debt. Defendants argue that the confusion in dates was due to the due date falling on a legal holiday.

The first communication, on April 21, 2015, informed Plaintiff, "[t]o cure the default, you must pay the full amount of the default on this loan by 05/26/2015 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter)." (Doc. 74-1, Stipulated Exs. at PAGEID# 1261). The next letter stated, "[i]f you fail to make payment by May 24, 2015, this [reinstatement] offer has been revoked and foreclosure proceedings may continue and a foreclosure sale may occur." (*Id.* at PAGEID# 1267).

Plaintiff cites no case law which provides the Defendants' behavior is a violation of the FDCPA. In 2015, May 24th was the Sunday of Memorial day weekend, meaning Tuesday, May 26th, was the first business day of the week. Caliber argues that "[a] consumer willing to

'consider carefully' the contents of these communications would not be misled or confused," by the different dates. (Doc. 106, Defs.' Mem. Opp. at 16 (quoting *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 172 (6th Cir. 2011))). The Court disagrees and finds that these communications could be misleading to the least-sophisticated-consumer. The least-sophisticated consumer looking at these mailings would not know on which date the payment was due. If the payment was actually due on the 24th, the least-sophisticated consumer may believe that payment needs to be delivered by Friday, May 22nd, in order to pay before May 24th. If the payment was not actually due until May 26, 2015, then Defendants' communications were misleading in asking for payment sooner than was required. If the payment was actually due May 24th, then the earlier statement that payment was due on May 26th is also misleading because it may convince the consumer to make a late payment. These kinds of procedural missteps are why the FDCPA contains a bona fide error provision, but Defendants did not argue this was a bona fide error. Plaintiff is entitled to summary judgment on this claim.

### 3. Credit Reporting

Plaintiff also claims that Defendants committed a violation of § 1692e(5) which prohibits debt collectors from threatening "to take any action that cannot legally be taken or that is not intended to be taken." Plaintiff alleges that Defendants violated § 1692e(5) by threatening to report his failure to pay to credit reporting agencies within sixty days of his challenge to his past due amount. Plaintiff argues that "after receiving Mr. Richard's April 15, 2015 QWR, Caliber could not legally report any adverse information about Mr. Richard's credit until June 14, 2015, at the very earliest (60 days from April 15, 2015)." (Doc. 102, Pl.'s Mot. at 21). Plaintiff alleges Caliber improperly threatened action twice. First, in the April 21, 2015 letter to Plaintiff, Caliber stated, "You are notified that this default and any other legal action that may occur as a result

thereof may be reported to one or more local and national credit reporting agencies by Caliber Home Loans, Inc." (Doc. 74, Stipulated Exs. at PAGEID#1262). Second, Caliber's May 1, 2015 past due notice stated "Late payments will be reported to the credit bureaus." (*Id.* at PAGEID# 1272).

Under 12 C.F.R. § 1024.35(i)(1), once a servicer receives a notice of error, "a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error." Plaintiff thus alleges that Caliber threatened to report his failure to pay to credit agencies within sixty days of the receipt of the Third QWR. Caliber argues that the language was not threatening imminent action and thus, neither letter violated the FDCPA. The Court agrees with Plaintiff. Caliber's statement that late payments "will be reported to the credit bureaus," when viewed within a letter informing Plaintiff that he was late in paying could clearly confuse the least-sophisticated consumer into believing that Caliber planned to report the late payment to the credit bureaus before 12 C.F.R. § 1024.35(i)(1) allowed Caliber to do so. Plaintiff is entitled to summary judgment on this claim.

### 4. Counterclaims

Plaintiff last alleges that Defendants' filing of frivolous counterclaims is a retaliatory and abusive debt collection practice in violation of § 1692f. Although § 1692f does not specifically enumerate that frivolous court filings could be considered abusive, Plaintiff is correct that the examples in § 1692f are explicitly non-exhaustive. Neither party provides any case similar to Plaintiff's claim. The Sixth Circuit has considered similar issues and found that "even when viewed from the perspective of an unsophisticated consumer, the filing of a debt-collection lawsuit without the immediate means of proving the debt does not have the natural consequence

of harassing, abusing, or oppressing a debtor." *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330–31 (6th Cir. 2006). The *Harvey* court also found that "*[a]ny* attempt to collect a defaulted debt will be unwanted by a debtor, but employing the court system in the way alleged by Harvey cannot be said to be an abusive tactic under the FDCPA." *Id.* (emphasis in original). Although *Harvey* considered claims under § 1692d, the Court finds that the counterclaims in this case were not abusive because they were not frivolous or completely unwarranted. In fact, this Court has already confirmed the Magistrate Judge's finding "that it was 'objectively reasonable for Defendants to assert their counterclaims at the time of their pleading.'" (Doc. 108, June 14, 2017 Order at 2 (quoting Doc. 94, April 24, 2017 Report and Rec. at 5)). Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's FDCPA claim regarding Defendants' counterclaims is **GRANTED**.

## C.     RESPA

Plaintiff alleges that Defendants violated RESPA by failing to respond to his Third QWR in a timely and adequate manner. He alleges that Caliber's response was late and failed to mention the name, address, and telephone number of his note's owner and that it did not identify the name of the master servicer of the note. Defendants argue that Caliber did not have to respond to the Third QWR because it was sent to the wrong address, and that even if Caliber did have to respond, then Caliber's response was adequate to satisfy RESPA.

RESPA is a remedial statute designed "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601. Upon receipt of a QWR, a servicer must acknowledge "receipt of the correspondence within 5 days" and respond within 30 days by making appropriate corrections to the borrower's account or, after

investigation, providing a written explanation including "a statement of reasons the servicer believes the account is correct" or any other information requested by the borrower.  12 U.S.C. §§ 2605(e)(1)(A), (e)(2).  "[T]o state a viable claim under RESPA, a plaintiff must show that he sent a correspondence which met the requirements of a QWR, that the servicer failed to timely respond, and that this failure caused plaintiff actual damages."  *Jestes v. Saxon Mortg. Servs., Inc.*, No. 2:11-00059, 2014 WL 1847806, at *5 (M.D. Tenn. May 8, 2014) (citing *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 241 (5th Cir. 2014)).

The first requirement for Plaintiff's RESPA claim is that he can prove he sent a QWR to Defendants.  A QWR must be a written request that identifies the borrower and "includes a statement of the reasons for the belief . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B). The Department of Housing and Urban Development promulgated "Regulation X" to implement RESPA and the Consumer Financial Protection Bureau adopted Regulation X when it took over the consumer protection function under RESPA.  Regulation X provides that "[a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to request information in accordance with the procedures in this section."  12 C.F.R. § 1024.36.  The Second and Tenth Circuits have both held that "'Regulation X's grant of authority to servicers to designate an exclusive address is a permissible construction of RESPA,' and thus '[f]ailure to send the [request] to the designated address . . . does not trigger the servicer's duties under RESPA.'"  *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181–82 (2d Cir. 2014) (quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148–49 (10th Cir. 2013)).  At least two other courts have held that sending a letter to a servicer's attorney is insufficient to trigger a servicer's duty to respond.  *Stein v. Nat'l City Bank*, No. CIV. 09-1995, 2010 WL 5559528, at *5 (D. Minn. Nov.

22, 2010), R&R adopted *sub nom.*, *Stein v. Chase Home Fin., LLC*, No. CIV. 09-1995, 2011 WL 70710 (D. Minn. Jan. 7, 2011), aff'd, 662 F.3d 976 (8th Cir. 2011); *Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 WL 2250856, at *3 (N.D. Ill. Sept. 8, 2005).

Defendants allege that they designated a specific address for the receipt of QWRs in accordance with Regulation X. Plaintiff does not dispute that Caliber designated an address in its March 2015 mortgage statement, and instead argues that strict enforcement of Regulation X in this case essentially strips Plaintiff of his ability to use an attorney. However, the Ohio Rules of Professional Conduct consider such situations in the comments to Rule 4.2. Although it is true that Plaintiff's attorney could not contact Caliber as it knew Caliber was represented in this matter and Plaintiff's attorney did not have permission, the comments make clear that Rule 4.2 does not bar "a lawyer . . . from advising a client concerning a communication that the client is legally entitled to make." Rules of Prof. Conduct 4.2, cmt. 4. Client to client communication is a communication a client is legally entitled to make. *Id.* In fact, Plaintiff's attorney did not cite inability to use counsel when the parties discussed this specific mailing. Instead, he stated that "Mr. Richard's efforts to communicate with Caliber only result in frustration as evidenced by the history of litigation between the parties." (Doc. 74-1, Stipulated Exs. at PAGEID# 189–190). Despite Folland's suggestion that Plaintiff contact Caliber directly, Gerling mailed the purported QWR to Folland. The Court agrees with the Second and Tenth circuits that Plaintiff's failure to mail the QWR to the correct address forecloses his RESPA claim. Defendants' Motion regarding Plaintiff's RESPA claim is **GRANTED**.

**D.    TILA**

Plaintiff's TILA claim is brought only against VOLT because "TILA expressly exempts servicers from liability unless the servicer was also a creditor or a creditor's assignee." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013). Plaintiff alleges that liability should

be found against VOLT because its servicer, Caliber, failed to provide obligated information and that "[e]ven technical or minor violations of TILA impose liability on the lender."  (Doc. 102, Pl.'s Mot. at 24 (citing *Weeden v. Auto Workers Credit Union, Inc.*, No. 97-3073, 173 F.3d 857, 1999 WL 191430, at *4 (6th Cir. March 19, 1999))).   VOLT argues that it provided the statutorily obligated information when it provided Plaintiff with the name of the trust holding Plaintiff's mortgage, VOLT's counsel's phone number and address, and by repeatedly providing "the name of the Trust and Caliber's address and phone number."  (Doc. 86, Defs.' Mot. at 18 (citing Doc. 86-3, Alexis Aff. at Exs. 12 and 16)).   Caliber also argues that the response to Plaintiff identified its own address and phone number as the contact information for the Trust.

TILA requires that upon "[u]pon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation."  15 U.S.C. § 1641(f)(2).  The Sixth Circuit has been exceedingly clear that "TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer."  *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998), as amended (Mar. 26, 1999).

Plaintiff's QWR clearly requested "the name, address, and telephone number of the owner of their note, plus the name of the master servicer of their note" in accordance with TILA.  (Doc. 74-1 Stipulated Exs. at PAGEID# 1256).   There is no question that Caliber's response identified the name of the owner of the note.  Caliber's notification of default to Richard stated that the default notice was sent "on behalf of Volt RPL XI Asset Holdings Trust . . . ."  (*Id.* at Ex. 16, PAGEID# 2417).   Caliber's document explicitly stated that it was a response to the Third QWR does not mention VOLT.  (Doc. 74-1, Stipulated Exs. at PAGEID# 1274–75).   Plaintiff argues that these are insufficient to satisfy TILA because the letters do not specifically state that

the owner of the loan is VOLT. Plaintiff points to no case law or portion of TILA requiring the response to be so explicit and the Court finds that no such requirement exists. The statute only requires that the servicer "provide . . . the name . . . of the owner of the obligation." 15 U.S.C. § 1641(f)(2). The Court also agrees with *Justice v. Ocwen Loan Servicing*, No. 2:13-CV-165, 2015 WL 235738, at *14 (S.D. Ohio Jan. 16, 2015) (Sargus, J.) in holding that identification of the owner as a trust is sufficient to state the owner of the trust, even if the responses does not specifically state that the trust is the owner.

Defendants next argue that providing the address and contact information for both Caliber and VOLT's counsel was sufficient to satisfy Plaintiff's requests. Defendants argue that its QWR response in June 2013 sufficiently provided Plaintiff with the information requested and that it did not need to provide the new information as Plaintiff was well aware Caliber serviced the loan. Alternatively, Defendants argue that the proper contact information for Caliber was Defendants' counsel's information. The Court finds no support for either of Defendants' arguments. As Alexis readily admits, loans in the mortgage industry can change owners quickly. (Doc. 82-1, Alexis Dep. at 74). TILA does not require that Plaintiff be uninformed in order to be allowed to request information or that the servicer should provide the best contact information. TILA requires that lenders provide the address and telephone number of the owner of the note. 15 U.S.C. § 1641(f)(2). Regardless of whether the proper contact information was Defendants' counsel or Caliber, TILA requires the name and address of the owner, not the contact information of a note owner's surrogates, assignees, or agents. As in *Justice*, whether Plaintiff had knowledge of VOLT's address and phone number is relevant to the damages calculations in this case, not whether VOLT complied with TILA. *Justice*, 2015 WL

235738 at *15. Accordingly, the Court **DENIES in part** Defendants' Motion as to the TILA claim and **GRANTS in part** Plaintiff's Motion as to liability only.

## IV. CONCLUSION

Based on the foregoing, both Plaintiff's and Defendants' Motions for Summary Judgment are **GRANTED in part** and **DENIED in part** as noted. Defendants shall provide the additional evidence of the amount due as noted in Section III.A.2 by **October 30, 2017**. In addition, Defendants shall also provide calculations and evidence of their damages in this case. Plaintiff shall reply to Defendants' filing and provide evidence and calculations of his damages by **November 30, 2017**. Defendants will then have until **December 14, 2017** to respond. In the interim, if the parties wish to mediate the case, they should contact Judge Smith's chambers at (614) 719-3220 to arrange for a mediation date.

**IT IS SO ORDERED.**

                                      **/s/ George C. Smith**
                                      **GEORGE C. SMITH, JUDGE**
                                      **UNITED STATES DISTRICT COURT**