# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**DENNIS G. RICHARD,**

      Plaintiff,

  v.                                Case No.: 2:15;cv-2647
                                        JUDGE GEORGE C. SMITH
                                        Magistrate Judge Deavers

**CALIBER HOME LOANS, INC.,** *et al.*,

      Defendants.

## OPINION AND ORDER

This matter is before the Court upon Defendants Caliber Home Loans, Inc.'s ("Caliber") and VOLT RPL XI Asset Holdings Trust's (the "Trust") Renewed Motion for Summary Judgment and Submission of Additional Evidence (Doc. 111), as well as the parties' cross-motions for summary judgment (Docs. 86 and 102) on certain claims that were not disposed of in the Court's previous summary judgment Order (Doc. 110). The motions are fully briefed and ripe for disposition. For the following reasons, summary judgment in favor of Defendants is **GRANTED IN PART and DENIED IN PART**, and summary judgment in favor Plaintiff is **GRANTED IN PART and DENIED IN PART**.

    I.      BACKGROUND

This case arises from a mortgage obtained by Plaintiff Dennis Richard for a home purchased in 2005. (Doc. 3, Compl. at ¶ 23). This lawsuit is Richard's third lawsuit against Caliber relating to their servicing of his mortgage. Each of the earlier two lawsuits resulted in settlements and dismissals of Richard's claims. Richard brought suit in this case, alleging

violations of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*

The facts underlying all three suits are set forth in detail in the Court's previous Order (Doc. 110) disposing of certain portions of the parties' cross-motions for summary judgment (Docs. 86 and 102) and will not be repeated here. As part of that Order, the Court found it was unable to rule on certain claims because the record did not provide sufficient evidence of the amount owed by Richard on the mortgage at the time he entered into the second settlement agreement ("SSA") with Defendants. (*Id.* at 14–15). The Court therefore directed Defendants

> to provide sufficient evidence that the underpayments in 2014 directly led to the amount due that was sent to Plaintiff in March 2015. This evidence should include, but should not be limited to, documents evidencing the existence of the debt, documents evidencing the imposition of any fees or costs, and evidence which provides the dates of Plaintiff's changing amount due.

(*Id.* at 15). The Court also directed Defendants to provide calculations and evidence of their damages. (*Id.* at 25).

As requested, Defendants filed the present Motion, attaching an affidavit of Serge Alexis, a default servicing officer for Caliber, and documentation regarding Richard's payments, outstanding balances, and Defendants' damages. (Doc. 111-1, Alexis Aff. and attached Exhibits 1–9). Defendants' Motion also invites the Court to reconsider portions of the earlier Order that were unfavorable to Defendants. The Court turns to this aspect of Defendants' Motion first.

## II. REQUEST FOR RECONSIDERATION

Defendants ask the Court to exercise its discretion under Federal Rule of Civil Procedure 54(b) to modify the interlocutory Order to the extent it granted summary judgment for Richard on certain claims. Defendant is correct that the Order is interlocutory and therefore "may be revised at any time before the entry of a judgment adjudicating all the claims." Fed. R. Civ. P.

54(b). Typically, however, courts will reconsider previous interlocutory orders only "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009).

Defendants ignore this standard in their briefing and assert only that "[t]hrough the Summary Judgment Order, the Court narrowed the issues in this matter significantly. The parties and the Court can now focus in greater detail on the specific communications and [ ] theories at issue." (Doc. 111, Defs.' Mot. at 3). But the Court "narrowed the issues" by already deciding the claims that Defendants are now attempting to re-argue; reconsidering them at this stage would undo any of the narrowing accomplished in the previous Order. Defendants also have not presented any new evidence or new arguments that they could not have included with their previous summary judgment briefs. Finding no compelling reason to revisit its previous decisions, the Court declines to exercise its discretion to modify the Order. The Court now turns to the remaining claims on summary judgment.

### III. SUMMARY JUDGMENT STANDARD

Both parties move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party;

evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## IV. DISCUSSION

In its previous Order, the Court disposed of Richard's FDCPA claims regarding Caliber's alleged failure to spread Richard's escrow shortage (in favor of Defendants), Caliber's attempt to collect an amount not authorized by the SSA (in favor of Defendants), Caliber's providing

conflict due dates to cure the loan default (in favor of Richard), Caliber's indication that it would report the loan default to credit agencies before it could legally take such action (in favor of Richard), and Caliber's allegedly frivolous counterclaims (in favor of Caliber). (Doc. 110 at 12–13, 16–20). The Court now turns to Richard's remaining claims under the FDCPA and Defendants' counterclaims.

**A.     Richard's Remaining FDCPA Claims**

Richard's remaining FDCPA claims involve §§ 1692e(2)(A) and (5). Richard argues that Caliber violated § 1692e(2)(A) when it "falsely represented that Mr. Richard [was past due in the amount of] $2,749.16" in its March 16, 2015 mortgage statement, "when in fact Mr. Richard was current." (Doc. 102, Richard's Mot. for Summ. J. at 20–21). Similarly, Richard argues that Caliber violated § 1692e(5) "by illegally stating it could foreclose on Mr. Richard's home despite the fact that he was not in default" in its April 21, 2015 letter. (*Id.* at 22). For the same reasons, Richard argues that Caliber's letters of April 21 and April 24, 2015 seeking $1,626.06 (the $2,749.16 in overdue monthly payments, less the unapplied funds of $1,123.10 in Richard's suspense account) to cure his loan default were false and misleading.

Richard's belief that he was current on his mortgage stems from his belief that the SSA eliminated any then-outstanding deficiencies in his mortgage payments. However, the Court previously determined that this was not the case. (Doc. 110, Order at 14–15). Defendants' obligations under the SSA were to waive deferred interest and fees and to spread the escrow deficiency over a period of 60 months. (Doc. 74-1, SSA at § 3, PAGEID #1157). Defendants did not waive any outstanding principal, interest, or escrow balance, and the SSA's integration clause expressly left intact "any applicable notes or mortgages." (*Id.* at § 10, PAGEID #1158–59). Therefore, so long as Caliber accurately quoted the $1,626.06 amount necessary to cure

5

Richard's loan default, Richard's remaining FDCPA claims are not viable. The additional information provided by Defendants establishes that the quoted amount was accurate.

### 1. Richard's escrow deposit and adjustment increases as of January 1, 2014

It is undisputed that Richard was current on his mortgage payments as of January 1, 2014. On that date, Richard's monthly charges increased from $1,406.00 to $1,470.12 due to an increase in Richard's escrow deposit and adjustment (stemming from increases in his homeowners' insurance and property taxes). (Doc. 111-1, Escrow Analysis, PAGEID #3151). Caliber sent Richard an Annual Escrow Account Disclosure Statement dated November 25, 2013, explaining the increase and stating that, "[b]eginning January 01, 2014, the [escrow] shortage will be collected by adding an additional $214.41 to your monthly payment." (*Id.*) However, the $214.41 escrow adjustment was "additional" only in the sense that it was applied in addition to principal, interest, and the escrow deposit; Richard's overall monthly charges increased only by $64.12 (from $1,406.00 to $1,470.12). (*Id.*)

### 2. Richard's payments and Caliber's application of funds prior to the SSA

Richard made timely payments of $1,470.12 for each of January through May of 2015. (Doc. 111-1, Payment History, PAGEID #3170). However, having concluded that his monthly charges should not include the $214.41 escrow adjustment, Richard began making payments of only $1,255.71 (equal to $1,470.12 less $214.41) each month for June through December of 2014. (*Id.*).

This meant Richard's June payment was short by $214.41. Caliber's practice, as provided by the Mortgage, was to place "partial payments [that] are insufficient to bring the Loan current" in Richard's "suspense account," also referred to as "unapplied funds," "until Borrower makes payment to bring the Loan current." (Doc. 74-1, Mortgage § 1, PAGEID #1041, 1043). Thus, Richard's June payment of $1,255.71 was held as unapplied funds until

6

Richard made his next payment of $1,255.71 for July. At that time, Caliber took the entire $1,255.71 June payment and $214.41 from the July payment to satisfy Richard's $1,470.12 June balance. (Doc. 111-1, Payment History, PAGEID #3170). Richard's loan was now current as of June 1, 2014, but only $1,031.30 remained from his July payment. Since this amount was $428.82 short of the $1,470.12 he owed for July, Caliber placed the $1,031.30 in suspense until Richard made another payment in August. (*Id.*). This process continued with each of Richard's August, September, and October payments, such that after completing the payment due September 1, Richard was $1,072.05 behind on his monthly payments. (*Id.*).

On October 31, 2014, Richard made another payment of $1,255.71. (*Id.*). Of that amount, $1,072.05 was applied, along with the $398.07 then remaining in Richard's suspense account, to satisfy Richard's October 1 charge. This brought Richard current with his loan obligations as of October 1, and because his November 1 payment was not yet due, there remained an excess payment of $183.66. In accordance with the Mortgage, Caliber applied this $183.66 to Richard's principal balance. (Doc. 74-1, Mortgage § 2, PAGEID #1043) ("Any remaining amounts [after application to interest, principal, and escrow items due under the Note] shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.").[1] At this point, nothing remained in Richard's suspense account.

### 3. Richard's monthly charges are adjusted pursuant to the SSA

As part of the parties' SSA negotiations at the end of 2014, Caliber agreed to spread Richard's escrow deficiency over a period of 60 months. This had the effect of decreasing Richard's monthly charges from $1,470.12 to $1,374.58 as of November 1, 2014. Caliber sent

---

[1] In his opposition brief, Richard argues that Caliber was not permitted to apply the excess $183.66 to his principal and was instead required to place it in suspense. The Court does not find this argument consistent with the language of the mortgage quoted above.

7

Richard's counsel an Annual Escrow Account Disclosure Statement dated December 16, 2014 explaining the adjustment. (Doc. 74-1, Disclosure Statement, PAGEID #3174–75).

Richard had made a payment, still in the amount of $1,255.71, on November 29, 2014. (Doc. 111-1, Payment History, PAGEID #3170). Because it was short of the $1,470.12 owing as of November 1, and because Richard did not have any unapplied funds at the time to complete the payment, Caliber placed the full $1,255.71 in suspense. (*Id.*). Although the amount owing as of November 1 was later adjusted via the SSA to $1,374.58, Richard's $1,255.71 payment was still short of that amount and therefore the full $1,255.71 remained in suspense. On December 17, 2014, the day the Richard executed the SSA, Richard owed the $1,374.58 for his November 1 charge and the $1,374.58 for his December 1 charge, and had the $1,255.71 from his November 29 payment in his suspense account. Thus, he owed $1,374.58 + $1,374.58 – $1,255.71 = $1,493.45 as of December 17, 2014.

### 4. Richard's payments and Caliber's application of funds following the SSA

Richard made his next payment on December 31, 2014 in the amount of $1,255.71. (Doc. 111-1, Payment History, PAGEID #3171). Caliber applied the $1,255.71 in Richard's suspense account along with $118.87 of the December 31 payment to satisfy Richard's still outstanding November 1, 2014 charge, and placed the remaining $1,136.84 from the December 31 payment in suspense. (*Id.*).

Richard's next payment was for $1,370.00 on January 29, 2015. (*Id.*). Caliber applied the $1,136.84 in Richard's suspense account along with $237.74 of the January 29 payment to satisfy Richard's still outstanding December 1, 2014 charge, and placed the remaining $1,132.26 in suspense. (*Id.*).

On February 26, 2015, Richard made another payment of $1,370.00. (*Id.*). Caliber applied the $1,132.26 in Richard's suspense account along with $242.32 of the February 26

8

payment to satisfy Richard's still outstanding January 1, 2015 charge, and placed the remaining $1,127.68 in suspense. (*Id.*).

### 5. Caliber's March 16, 2015 mortgage statement and April 21 and 24, 2015 letters

The February 26, 2015 payment was the last payment Richard made before Caliber sent the March 16, 2015 mortgage statement. Thus, at that time, Richard owed his February 1, 2015 payment of $1,374.58 and his March 1, 2015 payment of $1,374.58, for a total past due amount of $2,749.16. This is the past due amount reflected on the March 16, 2015 mortgage statement (Doc. 102, PAGEID #2877) and the Court concludes that it is accurate. Defendants therefore did not violate the FDCPA by "falsely represent[ing] that Mr. Richard [was past due in the amount of] $2,749.16" in its March 16, 2015 mortgage statement, "when in fact Mr. Richard was current," as contended by Richard.

Similarly, the Court finds no inaccuracies in the amounts needed to cure the loan default set forth in Caliber's April 21 and April 24, 2015 letters. After the March 16, 2015 mortgage statement, Richard made another payment of $1,370.00 on March 30, 2015. Caliber applied $246.90 of this payment, along with the $1,127.68 then in Richard's suspense account, to satisfy the still outstanding February 1, 2015 charge, and placed the remaining $1,123.10 in suspense. (Doc. 111-1, Payment History, PAGEID #3171). This meant, as of April 21 and April 24, 2015, Richard owed his March 1, 2015 payment of $1,374.58 and his April 1, 2015 payment of $1,374.58, for a total past due amount of $2,749.16. After subtracting the $1,123.10 in suspense, Caliber accurately reported in the two April letters that Richard must pay $1,626.06 to bring the loan current. (Doc. 74-1, April 21, 2015 letter, PAGEID #1261–63; April 24, 2015 letter, PAGEID #1265–70). Accordingly, Caliber did not violate the FDCPA "by illegally stating it could foreclose on Mr. Richard's home despite the fact that he was not in default" in its April 21,

9

2015 letter, as contended by Richard. Nor was the demand for $1,626.06 to bring the loan current in the two letters false or misleading.

Although Richard does not dispute the amounts he paid or the breakdown in how Caliber actually applied the funds, Richard still maintains that Caliber improperly calculated the amounts he owed beginning on January 1, 2014, when his monthly charges increased from $1,406.00 to $1,470.12. In so doing, he asks the Court to "go back to the first settlement agreement and the accompanying loan modification." (Doc. 112, Richard's Mem. in Opp. at 8). The Court declines this invitation, however, because in the SSA, Richard released any claims against Defendants "from the beginning of time until the Effective Date, whether known or unknown, whether arising out of or related to the Property, the Mortgage or otherwise, including those that were or which could have been brought in the [Second Litigation]." (Doc. 74-1, SSA § 6, PAGEID #1158). The second litigation was commenced on April 24, 2014 and the SSA was effective January 8, 2015. Accordingly, Richard could have brought any claims for miscalculation of his mortgage charges as of January 1, 2014 in the second litigation, and, in any case, he released all claims against Defendants existing as of January 8, 2015. The Court therefore holds that Defendants cannot be liable for any miscalculation of Richard's mortgage charges that occurred prior to January 8, 2015. As a result, Defendants are entitled to summary judgment on Richard's remaining FDCPA claims under § 1692e(2)(A) and (5).

**B.    Defendants' Claim for Breach of the Second Settlement Agreement**

Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). As to the first two elements, the parties agree that the SSA is a valid contract,

and Richard has not demonstrated any failure to perform by Defendants.[2] As to the third and fourth elements, Defendants argue that Richard breached the SSA, specifically its release provisions, by sending a letter to Caliber on April 15, 2015 seeking information regarding his loan balance and disputing his delinquency under RESPA and TILA, and by commencing this action, when Richard had already released any claims regarding his loan balance. These breaches, Defendants contend, resulted in damages in the form of attorney's fees accrued in defense of this action and entitle Defendants to rescind the SSA.

The Court is unable to locate a provision of the SSA that Richard has breached. Section 6 of the SSA provides in pertinent part:

> Except for the obligations under this Agreement, Mr. Richard . . . releases and forever discharges Caliber [and the Trust] . . . from any and all claims, causes of action, damages, liabilities, fees, and expenses from the beginning of time until the Effective Date, whether known or unknown, whether arising out of or related to the Property, the Mortgage or otherwise, including those that were or which could have been brought in the Suit. . . . Notwithstanding the foregoing, nothing in this release relates to any future obligations or duties that may arise in the future between the Parties. Mr. Richard releases the right to assert any claims raised in this Lawsuit as a defense or affirmative defense in a future lawsuit; however, this release shall not constitute a waiver of Mr. Richard's right to assert any other defense and affirmative defense in future lawsuits between the parties.

(Doc. 74-1, PAGEID #1158). Caliber argues this provision "clearly prevents Plaintiff from continuing to challenge, after the Second Settlement Agreement, whether Plaintiff was delinquent as of the Second Settlement Agreement" (Doc. 86, Caliber's Motion at 5–6) and that "Plaintiff gave up his right to attempt to use any means to challenge Caliber's actions before the Second Settlement Agreement" (Doc. 113, Caliber's Reply at 4).

But Defendants' reading confuses a release of liability for a restraining order. Richard released Defendants from liability for any claims existing at the SSA's effective date (January 8,

---

[2] Although Richard asserted that Caliber failed to spread his escrow deficiency over a 60-month period as required by the SSA, the Court previously determined that Caliber did, in fact, properly spread the escrow deficiency. (Doc. 110, Order at 12–13).

2015), but Richard did not agree that he would not contact Caliber ever again regarding his loan balance—even regarding balances or deficiencies existing prior to January 8, 2015. Similarly, while the SSA's release provision may serve as a defense to liability for certain claims in the current action, it does not enjoin Richard from commencing a lawsuit. Ohio law observes a distinction between liability releases and covenants not to sue, and the SSA does not contain the latter. *See Riley v. City of Cincinnati*, 46 Ohio St. 2d 287, 295, 348 N.E.2d 135, 141 (1976). Moreover, the Court has determined that several of Richard's claims in the current action are meritorious and arose out of conduct that occurred after the effective date of the SSA. Thus, even if the SSA barred Richard from asserting certain claims, the SSA would not bar the commencement of this action.

Both parties made assumptions about the effect of the SSA that were not explicitly provided for: Richard assumed the SSA would make his loan account current; Defendants assumed they would hear no more about inaccuracies in Richard's loan balance. Even though these appear to be the primary outcomes the parties sought when entering into the SSA, they failed to make these requirements explicit. Because the SSA simply does not speak to the actions that Defendants construe as a breach, Richard is entitled to summary judgment on Defendants' claim for breach of contract. Accordingly, Richard is not liable for Defendants' attorney's fees and Defendants are not entitled to rescission of the SSA.

**C.   Defendants' Claim for Unjust Enrichment**

Unjust enrichment occurs "when a benefit is conferred and it would be inequitable to permit the benefiting party to retain the benefit without compensating the conferring party." *Kline v. Mortg. Elec. Sec. Sys.*, 154 F. Supp. 3d 567, 586 (S.D. Ohio 2015) (quoting *Meyer v. Chieffo*, 193 Ohio App.3d 51, 950 N.E.2d 1027, 1034 (2011)). A claim of unjust enrichment requires proof of three elements: "(1) a benefit conferred by a plaintiff upon a defendant;

12

(2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 834 N.E.2d 791, 799 (2005) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 465 N.E.2d 1298 (1984)).

Defendants claim that Richard was unjustly enriched when he retained the benefits of the SSA (the lump sum payment from Caliber; Caliber's waiver of deferred interest balance and deferred fees balance; and spreading the escrow deficiency repayment over 60 months), while at the same time "not abid[ing] by his broad obligation to release Defendants from then-existing claims, causes of action, damages, and liabilities" by "challenging his deficiency as of the Second Settlement Agreement." (Doc. 86, Defs.' Mot. for Summ. J. at 9).

Defendants' unjust enrichment claim is based on the same conduct complained of in Defendants' breach of contract claim. Indeed, the alleged unjust conduct is Richard's failure to fulfill his contractual obligations under the SSA. To prevent duplicative claims in these types of contexts, Ohio has adopted a rule that a plaintiff generally cannot maintain an unjust enrichment claim where the relationship between the parties is governed by an express contract. *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920, 924 (1989) (in the absence of fraud, illegality, or bad faith, plaintiffs may not recover in unjust enrichment and their only recourse is compensation in accordance with the terms of the written agreement).

Even if this were not the case, the Court has already determined that Richard had no contractual obligation to refrain from requesting clarifying information from Caliber or from commencing this action. There was therefore nothing unjust about Richard's seeking clarifying information from Caliber in his April 15, 2015 letter or in Richard's commencing this action to recover what he believed owed to him. Indeed, the Court has already determined that several of

13

Richard's claims under the FDCPA and TILA are meritorious. Accordingly, Richard is entitled to summary judgment on Defendants' claim for unjust enrichment.

**D.  Defendants' Request to Enjoin Richard from Commencing Future Litigation against Defendants**

Finally, Defendants have requested a "narrow injunction preventing Plaintiff from filing future lawsuits against Caliber in this Court until this Court determines that Plaintiff's proposed lawsuit is not barred by either the First Settlement Agreement or the Second Settlement Agreement." (Doc. 79-2, Caliber's Am. Countercl. ¶ 174). In support, Defendant cites *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 269 (6th Cir. 1998) and *Marbly v. Kay*, 2000 WL 1827783, at *2 (6th Cir. Dec. 8, 2000) for the proposition that there is "nothing unusual about imposing pre-filing restrictions in matters with a history of repetitive or vexatious litigation." *Feathers*, 141 F.3d at 269.

The Court does not find Richard's litigation practice to rise to the level of the plaintiffs in *Feathers* and *Marbly*. The injunction in *Feathers* was an attempt to stem a multiplicity of suits regarding the same property that had been ongoing for 90 years, and the plaintiff in *Marbly* had filed eight separate, duplicative lawsuits against the same defendants and involving the same facts. In contrast, although each of Richard's three lawsuits involve the same note and mortgage and the same defendants, each of his suits involve actions by Defendants that occurred subsequent to each previous suit. His lawsuits are therefore not duplicative, and while Defendants may find it inconvenient to defend them, the suits are not themselves vexatious.

Defendants also recognize that an injunction would be appropriate only if the Court determined that Richard had commenced this action in contravention of the SSA's release. (Doc. 91, Defs.' Reply at 12) ("[F]ollowing an adjudication on the merits in favor of Defendants on Defendants' counterclaims, an injunction on future lawsuits by Plaintiff against Defendants

would be warranted."). Having adjudicated Defendants' counterclaims on the merits in favor of Richard, the Court finds no grounds for requiring a pre-filing screening of any future lawsuits by Richard against Defendants. Accordingly, Richard is entitled to summary judgment on this claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**, and Richard's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. The Clerk shall remove Document 111 from the Court's pending motions list.

At this stage, the Court has granted summary judgment in favor of Richard as to liability for his claims for (1) violation of TILA as to the Trust's failure to provide required information upon request, (2) violation of the FDCPA as to Caliber's provision of conflicting due dates to bring his loan current, and (3) violation of the FDCPA as to Caliber's threat to report Richard's late payments to credit reporting agencies. All other claims by Richard and Defendants have been denied. All that remains is to determine the amount of damages owed to Richard as a result of Defendants' violations of TILA and the FDCPA. Richard shall file a brief containing evidence and calculations of any damages sought under these claims no later than **May 9, 2018**. Defendants shall file an opposition brief providing any opposing evidence and calculations regarding Richard's damages by **June 1, 2018**. Richard will then have until **June 15, 2018** to file a reply brief.

In the interim, the Court also encourages the parties to consider mediation to resolve the outstanding damages issues. If the parties wish to do so, they may contact Judge Smith's chambers to arrange for a mediation through the Court.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　*/s/ George C. Smith*
　　　　　　　　　　　　　　　　　　　**GEORGE C. SMITH, JUDGE**
　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**